## AFFIDAVIT OF SPECIAL AGENT TIMOTHY J. QUINN
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Timothy J. Quinn, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately 22 years.

2. I am currently assigned to the Lakeville Resident Agency within the Boston Division where my primary duties involve the investigation of a wide variety of federal criminal offenses.

3. During my employment with the FBI, I have conducted, and otherwise participated in, hundreds of investigations of violations of federal law, including drug and weapons-related crimes; white collar criminal offenses, including mail, wire, telemarketing, bankruptcy, securities, and insurance fraud; false statement and obstruction of justice-related offenses; terrorism offenses; and offenses involving complex computer and internet-based fraud. In the course of my work, I have gained experience in the use of various investigative tools and techniques.

4. I have personally participated in the execution of dozens of search warrants and arrest warrants involving a wide variety of local, state, and federal criminal violations. I have been an affiant on numerous affidavits for criminal complaints, Title III intercepts, and search and seizure warrants involving bank accounts, residences, vehicles, and cellular telephones. As a result of my training and experience, I have become familiar with the manner in which criminals use computers, email accounts, cellular telephones, cellular telephone technology, false and fictitious identities, bank accounts, virtual currency, "cash apps," and other means to facilitate their illegal activities and to thwart law enforcement investigations.

5.      Prior to my employment with the FBI, I worked for approximately three years as a certified public accountant for Deloitte & Touche, LLP, performing audits and forensic examinations of financial statements, reports, and records.

6.      As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

## PURPOSE OF AFFIDAVIT

7.      This affidavit is being submitted in support of a criminal complaint charging Lisa Marie Dower ("Dower"), a resident of Brockton, Massachusetts, with wire fraud, in violation of Title 18, United States Code, Section 1343, in connection with her embezzlement of approximately $870,000 from her former employer, J.P. Noonan Transportation, Inc. ("JP Noonan") during the approximate time period December 2014 through August 2020.

8.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other officers and witnesses. Among other things, I participated in interviews of employees and executives of, and attorneys representing, JP Noonan and reviewed materials that they provided to law enforcement.

9.      This affidavit does not set forth all of the facts developed during the course of this investigation and does not set forth all of my knowledge about this matter. Rather, this affidavit is intended merely to show that there is probable cause to believe that Dower committed the above-described offense.

## PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED

### Information Provided by JP Noonan

10.     On or about September 21, 2020, representatives of JP Noonan – including Chris Noonan (a partial owner of the company), Bill Vieno (Noonan's office manager/controller), and

attorney David Nagle, who was retained by company management to represent JP Noonan in this matter – reported a suspected embezzlement of approximately $870,000 from the company by Dower. Noonan, Vieno, and Nagle provided the following information:

11. JP Noonan is a large, family-owned transportation business which operates several related subsidiary businesses throughout the New England area.

12. In or around 2008, JP Noonan hired Dower to work in the company's payroll department. Up until her resignation on or about August 30, 2020, Dower was responsible for performing bookkeeping and other administrative duties for the company.

13. During the time period that Dower worked at JP Noonan, employees and independent contractors working for the company and its affiliated businesses were required to submit time logs, mileage logs, and other pertinent information to clerical workers assigned to the various JP Noonan facilities in connection with the company's payroll process. The clerical workers would accumulate the data submitted to them and forward the information to the payroll office where Dower was assigned. This process was completed each week in anticipation of the weekly payroll.

14. Dower shared the responsibility of entering the weekly payroll figures into a computer system and transmitting the payroll data to the payroll processing companies utilized by JP Noonan.

15. During her employment, Dower was one of only a few JP Noonan employees who had authorization to enter and make changes to the bank account information associated with employees and independent contractors working for the company and its affiliated businesses, most of whom received their weekly pay via direct deposit to their respective bank accounts.

16. One of JP Noonan's subsidiary businesses, J.E.P. Inc. ("JEP"), is a shipping and hauling company. JEP hires and pays employees and independent contractors to haul loads for the company.

17. Claiborne & Sons Transportation ("Claiborne") was an independent contractor that had hauled loads for JEP in the past. Claiborne's relationship with JEP, however, was terminated in or around December 2014.

18. At some point within the few months preceding the company's reporting of this matter, employees at JP Noonan discovered that Claiborne appeared to be receiving routine payments from JEP despite the termination of their relationship years ago.

19. In reviewing the matter further, JP Noonan employees discovered that the payments, which appeared to be intended for Claiborne, were in fact being routed via electronic direct deposit to account number xxxxxx8872 at Webster Bank (the "Recipient Account"), which appeared to be associated with Dower.

20. At various times during her employment with JP Noonan, Dower utilized the Recipient Account to receive direct deposit payments for her work at the company.

21. Upon discovery of the payments to Claiborne, JP Noonan retained forensic accounting firm Edelstein & Company, LLC ("Edelstein") to review the matter. Edelstein's forensic review involved the inspection of records and reports maintained by JP Noonan and by Solex Payroll Systems, Inc. ("Solex") and Paycom, two independent companies that provided payroll processing services for JP Noonan.[1]

---

[1] JP Noonan utilized Solex for payroll processing from approximately April 2008 through June 2011, and again from approximately October 2011 through November 2017, at which time JP Noonan transitioned to utilizing Paycom. Paycom remains the current payroll processor for JP Noonan.

22.     Upon completion of its review, Edelstein prepared a report indicating that, from on or about November 26, 2014 through on or about August 14, 2020, Dower appeared to have received approximately $870,000 in misdirected payments from JEP to the Recipient Account.[2]

23.     JP Noonan planned to terminate Dower based on this information. However, prior to the planned termination – of which JP Noonan had not notified Dower – Dower submitted her resignation on or about August 30, 2020.

### Review of Webster Bank Records

24.     I have obtained and reviewed certain records related to the Recipient Account, including the signature card and various account statements and supporting documents for the approximate time period November 2014 to September 2020. Those records reflect the following:

25.     Dower opened the Recipient Account at a Webster Bank branch located in Brockton, Massachusetts on or about January 12, 2012.

26.     From the date the Recipient Account was opened to the present, Dower was the sole account holder and only authorized signer on the account.

27.     On or about June 26, 2020, August 7, 2020, and August 14, 2020, the Recipient Account received electronic Automated Clearing House ("ACH") deposits from JEP in the amounts of $5,769.38, $4,476.65, and $5,334.55, respectively. These payments were identified by Edelstein during its forensic review, and they comprise only a small portion of the funds which appear to have been misappropriated by Dower.

---

[2] The first two misdirected deposits to the Recipient Account, which occurred on November 11, 2014 and December 2, 2014, were unrelated to Claiborne. They involved a different independent contractor called Top Elite Services.

### Processing/Routing of the ACH Deposits

28. In the course of my investigation, I obtained records from the Federal Reserve Bank ("FRB") in Atlanta, Georgia which relate to, among other things, the above-referenced June 26, 2020, August 7, 2020, and August 14, 2020 ACH deposits to the Recipient Account. I also obtained information from FRB Lead Business Analyst Gregg McAdams[3] regarding these and other ACH deposits to the Recipient Account.

29. According to McAdams, the aforementioned June 26, 2020, August 7, 2020, and August 14, 2020 ACH deposits to the Recipient Account were processed by the FRB and routed through the ACH network in the FRB's processing site located in New Jersey.

30. FRB records indicate that from on or about September 12, 2018 through on or about August 12, 2020, 41 ACH deposits to the Recipient Account totaling $278,141.38 were processed by the FRB and routed through the ACH network in the FRB's processing site located in New Jersey. These payments were identified by Edelstein during its forensic review, and they comprise a portion of the funds which appear to have been misappropriated by Dower totaling approximately $870,000.

### Control of and Expenditures from the Recipient Account

31. Webster Bank records show that on or about July 3, 2020, July 10, 2020, and July 17, 2020, the Recipient Account received electronic deposits from JP Noonan in the amounts of $320.92, $321.34, and $326.31, respectively. Based on information provided by Vieno, these

---

[3] McAdams' responsibilities at the FRB include working on payment-related matters and, specifically, ACH transactions.

deposits represent payroll payments made to Dower for work that she performed for JP Noonan, which she elected to have deposited into the Recipient Account.[4]

32.  Statements reflecting activity in the Recipient Account show a July 23, 2020 automated teller machine ("ATM") withdrawal, which was conducted at a Webster Bank branch located at 719 Belmont Street in Brockton, Massachusetts. I have reviewed surveillance photographs of the individual who made this ATM withdrawal and compared those photographs to a driver's license image of Dower, which I obtained from the Massachusetts Registry of Motor Vehicles. Based on this comparison, I believe that Dower is the individual who made the withdrawal.

33.  According to information provided by Vieno, Dower's total net pay for her work at JP Noonan from on or about July 1, 2020 through on or about July 31, 2020 was $2,001.90. Statements for the Recipient Account for the same time period reflect total expenditures of $9,257.29, an amount far in excess of Dower's total net pay from JP Noonan.[5] The expenditures were made in the form of ACH payments and withdrawals totaling $7,173.27, paid checks totaling $1,000, check card purchases totaling $784.02, and ATM withdrawals totaling $300. Payments to credit card companies alone, which are included in the ACH payment and withdrawal total,

---

[4] Based on information provided by Vieno, Dower's total net pay for July 3, 2020, July 10, 2020, and July 17, 2020 was $380.92, $381.34, and $386.31, respectively. The difference between these net pay amounts and the payroll deposits made into the Recipient Account on these dates is due to the fact that Dower elected to have a portion of each payment deposited into other bank accounts under her control.

[5] Aside from deposits directly attributable to Dower's legitimate pay from JP Noonan (not all of which was deposited into the Recipient Account), there was only one additional deposit into the Recipient Account during this time period, which was a check in the amount $2,220.56.

account for $4,358.67 in expenditures from the Recipient Account. Based on my review of financial records, it appears that Dower spent the embezzled funds primarily on living expenses.

34. Based on the information I have gathered to date regarding the Recipient Account, I believe that Dower is the only individual responsible for transacting business in the account.

### Information Provided by Solex

35. On September 28, 2020, I interviewed the President of Solex, Matt Kaplan. Kaplan advised that he had reviewed information available to him from the Solex payroll processing system and had also spoken to Solex employees who were familiar with the terminated JP Noonan account and Dower.

36. In viewing historical information contained within the Solex system for the Claiborne account, Kaplan observed that Claiborne was receiving payments from JEP via direct deposit to a bank account with account number ending in 0035 and routing number 011103093 as of September 2014.[6] On or about December 18, 2014, the direct deposit information in Claiborne's profile changed, and the new account to which the direct deposits were routed was the Recipient Account.

37. Kaplan advised that there is no data remaining in the Solex system that would allow him to identify the JP Noonan employee who made the December 2014 change to the Claiborne profile. However, Kaplan recalled that there was only one other JP Noonan employee besides Dower who had access and authorization to make changes to the direct deposit information associated with Claiborne at that time.

---

[6] Kaplan advised that he is no longer able to retrieve the entire account number for this account, however, I know, based upon publicly available information associated with the routing number, that the account is or was maintained at TD Bank.

38.     I interviewed the other JP Noonan employee identified by Kaplan, who stated that Dower was responsible for processing payroll for JEP. Based on information provided by Vieno, I understand that this other JP Noonan employee had access/authorization so that she could process the payroll when Dower was out of the office. I asked the other employee if she had anything to do with the misdirected Claiborne payments and she told me that she did not.

## CONCLUSION

39.     Based on the information described above, I have probable cause to believe that that Dower committed wire fraud, in violation of Title 18, United States Code, Section 1343.

Respectfully submitted,

*Timothy J. Quinn*
Timothy J. Quinn
Special Agent
Federal Bureau of Investigation

Electronically subscribed and telephonically
sworn to before me on November ___, 2020   **Nov 19, 2020**

*Judith Gail Dein*
THE HON. JUDITH G. DEIN
United States Magistrate Judge